**ERA Capital L.P. v Soleil Chartered Bank**

2024 NY Slip Op 34509(U)

December 23, 2024

Supreme Court, New York County

Docket Number: Index No. 651984/2019

Judge: Melissa A. Crane

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:     HON. MELISSA A. CRANE          PART _____ 60M _____
                                    *Justice*
-------------------------------------------------------------------X

ERA CAPITAL L.P.,                           INDEX NO.        651984/2019

                        Plaintiff,

                - v -                        DECISION AFTER BENCH TRIAL

SOLEIL CHARTERED BANK, SOLEIL CAPITALE
CORPORATION, REGIONS BANK

                        Defendant.
-------------------------------------------------------------------X

Melissa Crane, JSC

At summary judgment, this court dismissed plaintiff's claim for breach of fiduciary duty, but declined to dismiss plaintiff's claim for negligent misrepresentation. The Appellate Division, First Department affirmed this decision (216 A.D.3d 592 [1st Dep't 2023]), recognizing there were issues of fact concerning whether or not the parties had a special relationship. The case therefore proceeded to a bench trial on the issue of negligent misrepresentation.

The facts of this case are delineated in this court's summary judgment decision, *Era Capital L.P. v. Soleil Chartered Bank*, 2023 WL 158783 (N.Y. Sup. Ct. Jan. 10, 2023). The court presumes familiarity with that decision and will not repeat the facts again except as to those that are relevant to this decision after trial.

In sum, this dispute arises from a failed letter of credit ("LC") transaction that involved plaintiff ERA Capital L.P. ("ERA") and defendants Soleil Chartered Bank (individually, "SCB"), Soleil Capitale Corporation (individually "SCC," but together with SCB, "Soleil"), and

[* 1]

Regions Bank ("Regions"). ERA alleges that Regions, who merely "advised"[1] on the LCs, failed to investigate Soleil. Instead, according to plaintiff, Regions negligently told plaintiff that Soleil was "good" to be the LC's issuer, even after Regions received information that plaintiff claims should have led it to suspect that Soleil would issue LCs with no intention of making good on them.

However, at trial, plaintiff failed carry its burden to establish Regions had a duty to vet the bank or verify collateral. Plaintiff did not carry its burden to establish the parties had a special relationship sufficient to satisfy a claim for negligent misrepresentation. Nor did plaintiff establish that the information Regions did impart was incorrect. Plaintiff also did not establish reasonable reliance.

## FACTS – RELEVANT INDIVIDUALS

Amira Shapira ("Shapira") is the managing director and decision maker for ERA, a real estate investment company. ERA, or an affiliate, was the beneficiary on the two LCs in this case: (1) the $900,000 LC Soleil issued on February 26, 2018 ("$900K LC"); and (2) the $1.8M LC Soleil issued on March 22, 2018 ("$1.8M LC" [see J-18]). Only the latter LC is at issue in this case. That $1.8M LC was set to expire on June 22, 2018, and was for the account of IR Real Investments GMBH ("IR Real") to secure ERA's short-term loan of up to $925K for IR Right Investment GMBH (IR Right).

Amir Bramly is the individual with whom Shapira dealt with exclusively on the two loans, ostensibly to fund real estate projects. During the negotiations concerning the loans related to the LCs at issue in this case, Bramley's businesses were in liquidation and his assets

---

[1] "Advising" means Regions was merely authenticating the instrument and was not responsible to pay. Shapira understood the difference (TT at 268).

[* 2]

frozen in Israel. Bramly was convicted of operating a scheme that bilked investors out of $150 million and sentenced to 10 years in prison in October 2020, while this case was pending.

Simon Asseraf was the broker on the LCs. Although Bramly was the one obligated to pay the broker fee, ERA paid it, even before loaning any money, presumably to hide Bramly's involvement with the transaction. Bramly asked Shapira to fund the fee and would pay back Shapira's father in Israel (D-93).

Govind Srivastava ("Srivastava") was the owner and chief executive of SCC. (Trial Tr. ["TT"] 676-77, 718-19). SCC allegedly marketed LCs that SCB issued (TT 683, 720).

Jyoti Maewall, Srivastava's sibling, worked with Asseraf on behalf of SCC to document the LCs. Maewall did not know any details concerning SCB, despite partnering with it on letters of credit. Maewall did not know the identity of its owners, officers, directors, employees, type of entity or its relationship with SCC (TT 683-84). Other than claiming SCB was a Lichtenstein trust, Srivastava had no documentation, policies or information about the bank or its formation, ownership, or management, other than a copy of a Comoros banking license (TT 743-46). The alleged bank has no presence, operations, assets or licenses in the US, despite allegedly issuing LCs (*id.*). Srivastava testified it was a mere coincidence that both entities have the name "Soleil" (TT 747), a coincidence the court finds stunning considering the amount of collaboration between the two entities. There is no written agreement between the two entities (TT 747-48). SCC keeps all LC fees and Srivastava did not know how SCB benefits from its issuance of LCs (TT 748).

Regions provides various financial and banking-related services in the U.S. and served as ERA's primary U.S. bank since about April 2015, after Shapira opened two accounts. Carson

Strickland ("Strickland") was a Senior VP in Regions' Global Trade Finance Department, that markets LCs and other cross-border financing products.

Donald N. McCorkell, Jr. ("McCorkell") is a Senior VP at Regions and is the LC department manager to whom Shapira was referred after he requested assistance with ERA's needs in the two LC transactions. Shapira professed to be unfamiliar with LC transactions to McCorkell.

## FINDINGS OF FACT

Some troubling facts came out at trial concerning the underlying transactions and the persons involved. The actual transaction for which plaintiff needed the first letter of credit was to secure a loan to Roy Tzvi Horowitz for approximately $500,000. Subsequently, plaintiff needed a second LC to secure a short-term loan of up to $925,000 to IR Right.

Roy Tzvi Horowitz is none other than Bramly's brother-in-law. As mentioned earlier, Bramly was under indictment and his assets frozen at the time the events in this case took place. Despite the freezing of his assets, Mr. Bramly is also likely the true owner of IR Real. This is because, although the loans did not go to Bramly directly, or a company he owned, Shapira's negotiations for the loans underlying the LCs were entirely with Bramly. In addition, the draft LC emanated from Bramly's email account. Shapira was also aware that, at the time he was negotiating a loan with Bramly, Bramly's assets were in receivership having been placed in permanent liquidation in Israel. Before he loaned a dime, Shapira knew that Bramly could not pay Asseraf, the broker, directly. Instead, Shapira helped to avoid Bramly's involvement by having ERA pay the broker fee, and Bramly would repay that fee to Shapira's father in Israel (*see* D-93 [from Bramly "Hi, there is an account in that I can transfer (not from me or related to me) $30,000 (in NIS) that you will transfer in US dollars?"]).

[* 4]

Indeed, Shapira was poignantly aware of the trouble dealing with Bramly could cause. Previously, circa 2013, Bramly had talked Shapira, a Canadian citizen, into being a director of a company so that Bramly could operate in Quebec. That company, Capitalix, was included in the receivership of Bramly's assets. As a result, Shapira was forced to dissolve Capitalix in June 2017 (TT 38-39).

Nevertheless, despite expecting Regions to investigate the bank that would issue the LC, Shapira never disclosed Bramly to Regions at all. He did not inform Regions that he was negotiating entirely with Bramly and that Bramly likely was the true interest on the other side of the loan transaction. Shapira never disclosed that Bramly could not have anything to do with the transaction due to his 2016 asset freeze. Nor did Shapira disclose to Regions that Bramly had been indicted in the summer of 2016 for, inter alia, money laundering, fraud and bilking investors to the tune of $150M (TT 36-37; 168, 200-201; 218-220).

Instead, Shapira and Bramly ensured there was no record of Bramly's involvement in the loans or the LC transactions. ERA paid the broker on the LCs and helped Bramly hide his involvement. None of the documents involving the two loans or the LCs disclosed Bramly. Nor did Shapira disclose his past business transactions with Bramly that ended badly.

Shapira claims that had he known that Soliel was shady, he would never have entered into the LC transaction. The same can be said of Regions. Had Shapira disclosed Bramly to Regions, it would not have participated (Direct Examination Affidavit of Donald McCorkle [EDOC 238] ["McCorkell Aff.], ¶9).

A. **The Sequence of Relevant Events, Generally**

Before contacting Regions, Shapira testified that it was Bramly who suggested an LC to secure loans that ERA would make to a company Bramly controlled:

"Bramly assured me that the LC would be secure collateral. Bramly advised me that the borrower would have substantial assets with the issuer of the LC so that the LC would be fully collateralized. These statement [sic] matched my knowledge of how LCs were issued. I had no idea that an LC could issue without the issuer holding assets of the borrower to back up the LC. If McCorkell had told me that Soleil may not have assets as collateral, the loans would not have been made"

(Direct Examination of Amir Shapira [EDOC 277] "Shapira Aff. ¶ 18).

After speaking with Bramly about backing up the loans with a LC, Shapira approached Regions for assistance with obtaining one for his father's company, an affiliate of ERA. Eventually, he was referred to McCorkell. After a phone call in or around January 23, 2018, McCorkell emailed Shapira:

"Amir, nice speaking to you earlier. ***We would be happy to accommodate the standby letter of credit in your favor***. As discussed, we would need your customer's bank (preferably a US based bank) to do the following. Issue a standby letter of credit in favor of ERA Capital in the amount of $XXX, advised and confirmed by Regions Bank. The letter of credit must be subjected to the UCP600 or the ISP98. The credit must be irrevocable and must show a definite expiry date. The credit can be automatically renewable with 60 notice of non-renewal notification clause. The credit must be in US dollars and be payable against a simple statement that 'Applicant has defaulted under that certain agreement between ERA Capital and XXX, dated xx/xx/xxxx' "

(J-8).

The next day, January 24, 2018, Bramly sent Shapira a WhatsApp message with information related to the LC transaction they had discussed (*see* D-83-85; *see also* D-90). The message contained two documents: 1) a proposed draft LC; and 2) a document that listed, amongst other things, the issuing bank's SWIFT code information (*id.*). The proposed draft listed the issuer's name as "S CHARTERED BANK, NEW YORK." but did not list applicant or beneficiary names (D-84). The second document listed Standard Chartered Bank as the issuer and provided its SWIFT information, address, city, and postal code. Shapira forwarded Bramly's draft to McCorkell.

On January 30, 2018, Shapira sent McCorkell a 'corrected draft' of the LC and asked him to confirm that the changes were correct (J-11 at 0000000316). The draft was for a $900,000 irrevocable standby LC that "S CHARTERED BANK" would issue in ERA's favor as beneficiary, and listed IR Real Investments GMBH as the applicant (D-88). On January 31, 2018, at 10:50 am, McCorkell replied that he was on a plane but just landed and that the draft Shapira had emailed him "[was] fine" (J-39).

It is highly likely that Bramly drafted the draft LCs. This is because Srivastava testified that SCB did not use "S. Chartered Bank" on its LC instruments (TT 725), while Maewall did not prepare the draft (TT 659). Maewall worked with Asseraf, the LC broker, and did not receive this draft from him. Considering that Shapira received drafts of this document directly from Bramly, it is probable Bramly drafted it (D-83-85; *see also* D-90).

On February 21, 2018, on an unrelated LC transaction, also involving Soleil, McCorkell forwarded an email to Strickland and asked him the following: "Ever heard of this customer [Petroleo] sir? Never heard of them. They have an account with 1,100.00 and they use it exclusively for UBER riders and at Walgreens" (P-3).

Two minutes later, Strickland replied that he was not familiar with Petroleo, but assumed they were a branch client (J-20). He also commented that "Soleil is kind of shady - one of those companies that will just issue [LCs] because they are on SWIFT..." (*id.*). Strickland testified that his comment was an "off-the-cuff" remark after he conducted a short Google search (Direct Examination Aff. of Carson Strickland [EDOC 238] ["Strickland Aff."], ¶¶ 7, 14).

On February 25, 2018, Bramly sent Shapira a message with a copy of the LC (2/25/18 Message With Draft LC From Bramly to Shapira [D-94]). This copy identified the issuer as

[* 7]

Soliel for the first time (id.). Bramly did not bring to Shapira's attention that he had switched banks. Nor did Shapira notice the switch.

A day later, on February 26, 2018, Shapira sent McCorkell the standby LC Soliel issued, that Shapira had received from Bramly. Shapira asked McCorkell to "confirm once the SWIFT [hits] the bank and that everything looks in order" (J-10). At 9:51 am on that same day, McCorkell responded to Shapira's email and stated the following:

> "Amir, they totally threw me with the name of the issuing bank. *I have asked my compliance officer to quickly do a background check on Soliel Chartered Bank and get back to me*. In the past communications they list themselves as S. Chartered Bank, which I interpreted to be Standard Chartered Bank. Hold tight and I will get back to you shortly"

(J-11 [emphasis added]).

Shapira never disclosed that he had received the LC from Bramly. At no point did Shapira inform Regions that Bramly, who was under indictment for fraud, with all assets frozen, had chosen this bank. Shapira claims that he "sought clarification from Bramly, who advised me that Soliel was only an intermediary bank for the LC" (Shapira Aff. ¶ 40).

The "check" McCorkell referred to in his email was a "regulatory compliance check required by the Bank Secrecy Act and anti-money laundering regulations and [involved] reviewing the OFAC [Office of Foreign Asset Control of the U.S. Dep't of Treasury] website [and] [determining] if any of the parties were listed" ("OFAC Check") (McCorkell Aff., ¶ 16). McCorkle advised Shapira of the limited nature of this check:

> "I also advised Mr. Shapira of the nature of the regulatory background check that Regions was conducting, specifically, that it was an OFAC check and that Regions runs the parties' names through the government website to see if there are any matches to names that the U.S. Government had listed as prohibited parties"

(id., ¶ 17).

McCorkle also told Shapira that because Regions was not familiar with SCB, it could only act as "advising bank" (*id.*, ¶ 17). McCorkell watched as the check was conducted, and the results were returned, without any positive hits (*id.*, ¶ 18; *see also* J-26 OFAC Report at RB _6069). Regions regularly conducted OFAC Checks for all LC transactions (McCorkle Aff., ¶ 16).

McCorkle also felt comfortable with advising the LC as it was issued through SWIFT, meaning Soleil was vetted, verified, and had passed a rigorous screening test designed to eliminate fraudulent parties in similar transactions (*id.*, ¶ 22).

At 10:44 am, 53 minutes after he stated to Shapira that he requested his compliance officer to run a background check, McCorkell sent another message to Shapira that stated the following:

> "Amir, ***this bank is good*** but I would have preferred Standard Chartered Bank. One change needed to be made on the LC. It is asking for an authenticated SWIFT if/when you are claiming and I am sure you do not have SWIFT capabilities. Please have them change that to 'Written certification signed by an authorized officer of ERA Capital L.P.'"

(J-12).

The next day, February 27, 2018, Shapira followed up with McCorkell and emailed him the following: "Hi Donald, Did the representative for the LC creator spoke to you [sic]. I want to make sure everything is ok. Please contact me when you can…" (J-27).

Shortly thereafter, on March 1, 2018, at 2:17 pm, Strickland sent McCorkell an article from the Documentary Credit World titled "Fraudulent Letters of Credit; Commercial Fraud" ("DCW Article") and stated that "[he] saw [the article] in the [DCW] [and] [hoped] [the] transaction went away" (J-21). The article summarized legal proceedings against Soleil in New

York State Supreme Court that a LC customer initiated seeking recovery on "partial payment of an **issuance fee** for a $25 million [LC]" (J-21 [emphasis added]).

Strickland testified that his comment referred to the unrelated Petroleo transaction with Soleil (Strickland Aff., ¶ 12) and that it was unusual for him not to have heard of a proposed letter of credit before the credit department learned about it (*id.*).

McCorkell testified that he only glanced at the article's headline and that he remained unconcerned about the ERA transaction because the article involved the unrelated Petroleo transaction (McCorkell Aff., ¶ 58). He was also unconcerned because the disputes the article referenced were between an account party and an issuer, and stemmed from the payment of LC issuance fees, not an issuer's potential dishonor of a demand under an LC. Moreover, "[he] [was] not a lawyer and would not advise a customer regarding litigation" (*id.*, ¶¶ 58-59).

When Shapira asked McCorkell to confirm that the LC was in place, on March 2, 2018, at 6:24 am, McCorkell replied that they were "[j]ust waiting on [Montalvo] to sign off on one thing," and that "[Shapira] should have it [that day]" (J-28). McCorkell did not tell Shapira about the DCW article, Strickland's comments from the prior day, or raise any concerns about Soleil being the bank to issue the LC.

On the same day, Regions sent ERA the letter advising on the LC, that contained the following disclaimer: **"THIS LETTER IS SOLELY AN ADVICE OF THE ENCLOSED IRREVOCABLE STANDBY LETTER OF CREDIT AND CONVEYS NO ENGAGEMENT OR RESPONSIBILITY ON OUR PART"** (J-14, emphasis added).

On March 5, 2018 at 11:20 am, Shapira sent McCorkell a follow up email and asked "if all is good with the [LC]" (J-29 at RB0000001363). At 11:24 am, McCorkell replied that "[they] were good to go" (*id.* at 1362).

On or about March 25, 2018, Shapira's father caused ERA's affiliate to enter into its loan agreement (*see* J-3, J-4). There was some difficulty repaying this loan. As a result, ERA did make a draw request under the first LC with SCC. However, ultimately the loan was repaid, and ERA withdrew its request.

## B.  The Other LC for $1.8M

Meanwhile, in a separate transaction, the one underlying this lawsuit, on March 15, 2018, ERA itself entered into an agreement with IR Right for a Bridge Loan up to $925,000, with interest at LIBOR plus 3%, maturing June 7, 2018, for "a real estate [transaction] that he is doing in Tel Aviv, Israel" (J-15, J-16; Shapira Aff., ¶ 50). The loan was due in less than three months, with another LC providing security, this time for $1.8M, nearly twice the loan amount. In total, ERA disbursed about $862,000 under the bridge loan.

As with the first loan from ERA, on the second loan, the named borrower, IR Right, did not match the LC account party, IR Real (J-15). Shapira did not know whether IR Real and IR Right are different entities or Bramly's connection with either, but Shapira did not believe Bramly was publicly associated with either entity. However, Bramly must have been able to act for at least IR Real, because he was able to obtain LCs naming IR Real as the account party through a broker.

Shapira admits that "ERA did not perform due diligence on the assets or business of the foreign borrower" (Shapira Aff., ¶ 50). Shapira never asked for documents verifying Bramly's affiliation with either IR entity. ERA never checked that either entity even existed, or that there was, in fact, an underlying real estate project (TT at 278:16-22; 276:13-280:1). Shapira only had Bramly's promise that he, Bramly, would deposit collateral with the bank issuing the LC [Shapira Aff., ¶ 18] ["Bramly advised me that the borrower would have substantial assets

with the issuer of the LC so that the LC would be fully collateralized."]; *see also* TT at 394:3-10 [Bramly told Shapira "that (Bramly) would, in fact, put up collateral for the Letter of Credit."]).

Shapira himself did not verify that collateral had been delivered to SCB, or that collateral even existed. Shapira did not believe it was his responsibility to verify anything, including that the collateral had been tendered to the issuing bank.

Apparently, Shapira just expected that the LC would cover his losses and that the issuing bank would verify collateral. Importantly, he never communicated to McCorkell or anyone else at Regions that he was expecting Regions to perform the due diligence for him. **He never asked McCorkell to check to see if the borrower had deposited collateral with Soliel.** Nor did he inform McCorkell that he only had the words of someone indicted for fraud that the collateral was available to support the LC. He never asked McCorkell to check to see if Soliel would have the ability to make good on the LC. Yet, he blames McCorkell: "If McCorkell had told me that Soleil may not have assets as collateral, the loans would not have been made…" (Shapira Aff., ¶ 18).

Shapira never had any conversations with McCorkle or anyone else at Regions about the second loan transaction and second LC. Instead, on March 22, 2018, at 6:00 pm, Shapira simply notified McCorkell that ERA was to receive a $1.8M SWIFT LC from IR Real Investment GMBH that Soleil would issue that day and asked if McCorkell could confirm that Regions received and validated the LC on ERA's behalf. He did not have any communications with McCorkell about Soleil's suitability to issue the $1.8M LC.

Shapira testified that he proceeded with the later $1.8M LC because McCorkell previously stated that Soleil "[was] good" in connection with the first $900K LC, and that he assumed Soleil was an appropriate issuer for this second $1.8M LC as a result (Shapira Aff., ¶

[* 12]

65). But, Shapira knew that Regions' background check on the issuing bank was limited to checking OFAC because McCorkell had explained that to him (McCorkell Aff., ¶ 17 ["I also advised Mr. Shapira of the nature of the regulatory background check that Regions was conducting, specifically that it was an OFAC check and that Regions runs the parties names through the government website to see if there are any matches to names the US government has listed as prohibited parties."]).

On March 27, 2018, Regions sent ERA a letter advising on the $1.8M LC. This letter also contained the same disclaimer as on the first transaction: "THIS LETTER IS SOLELY AN ADVICE OF THE ENCLOSED IRREVOCABLE STANDBY [LC] AND CONVEYS NO ENGAGEMENT OR RESPONSIBILITY ON OUR PART" (J-18). Despite receiving this disclaimer, Shapira never communicated to Regions that he was, in fact, expecting Regions to investigate Soliel and/or verify the collateral.

On March 29, 2018, ERA disbursed $757,980 from its Regions deposit account to "ADV Yaron Berenholtz." Bramly claimed Berenholtz was an Israeli lawyer handling the alleged Israeli real estate transaction (D-9; Shapira Aff., ¶ 53).

Regions flagged ERA's outgoing wire and asked for more information. Shapira responded that the wire was "a short term loan (for two month) ... provided to IR RIGHT INVESTMENT (a company we work with in Europe)" secured by an irrevocable bank letter of credit of $1.8 million and ERA was "asked by IR to wire the loan proceeds to their lawyer's account Mr. Yaron Bernholtz [sic]" (J-43).

However, in actuality, ERA never spoke to anyone with IR Right. Rather, Shapira's only contact was Bramly (TT 167:5-168:18). Shapira did not disclose Bramly this time either, even

though Regions asked for more information and even though Bramly was a person Shapira did not trust (TT at 292).

By July 19, 2018, ERA had not been repaid. On July 19, 2018, ERA sent Regions a draw request for the full $1.8M under the $1.8M LC. ERA asked for this amount even though the outstanding balance on the loan was much less, around $817,438.24 (D-12; TT 332). Shapira admitted that the excess amount would be shared with the borrower because the borrower had put up collateral, or so he thought (TT 335-336; Shapira Aff., ¶¶ 72-73).

Shortly following this draw request, SCC realized that SCB had not obtained cash collateral or an indemnity agreement. SCB claimed it required indemnity agreements before LC issuance (*see* TT 730). Accordingly, as consideration for extending the LC, SCB required the applicant and the beneficiary (i.e., ERA) to sign an indemnity agreement (*see* D-24; D-25; TT 735-736). Of course, to require the beneficiary to indemnify the issuer of the LC defeats the purpose of the LC altogether. At trial, SCB's representatives failed to provide a satisfactory explanation for why they needed the beneficiary to provide indemnity and cash collateral.

SCC forwarded drafts of indemnity agreements for IR Real and ERA to sign to Asseraf, the broker (D-24, D-25). Asseraf promptly returned both signed agreements (D-26, D-27, D-29, D-66). ERA claims its signature on the ERA Indemnity Agreement is forged (TT at 323:15-19).

ERA agreed to extend the $1.8M LC to August 6, 2018 (D 53; D 56). Incredibly, even though there was difficulty paying back the first loan and now the second loan was in default, ERA agreed to disburse another $47,000. Shapira did this because he assumed the LC would provide reimbursement (Shapira Aff., ¶ 56).

The loan repayment and second LC were ultimately extended until September 2018. On September 5, 2018, Shapira received a letter purportedly signed by a Mr. Zawi advising that IR

Real, not the named borrower (J-3), could not repay the loan. Mr. Zawi sought more time (Shapira Aff., ¶ 58; J-31). On September 13, 2018, ERA sent the final draw to Regions, claiming $1.8 million under the $1.8M LC and that IR Real had defaulted in its contractual obligations to ERA (Shapira Aff., ¶ 59; J-19, D-21, D-58).

On September 14, 2018, Regions forwarded ERA's draw to SCB (D-22, D-59). On September 21, 2018, SCB rejected the draw as non-compliant (J-34).

Srivastava was responsible for determining whether a draw was valid and would be paid (TT 727:9-14). Srivastava gave three reasons for why he thought ERA's draw was noncompliant and, perhaps, fraudulent. First, the $1.8M LC specified that its purpose was to support a real estate purchase, yet there was no indication of the transaction. Second, ERA and IR Real had agreed to indemnify and provide cash collateral to SCB to fund a drawing, and neither had honored its indemnity. Third, ERA had made draws for various amounts, suggesting that the subject draw amount was fraudulent (TT at 737:24-739:1; 739:19-6; 740:7-741:2; *see also* J 35-36).

## C. Credibility Determinations

The court does not find Shapira to be particularly credible. He actively participated in hiding Bramly's involvement. For example, when Asseraf, the broker on the LC, wanted his fee up front, Shapira agreed to pay and have his father reimbursed. He knew that Bramly, under asset freeze and indictment, was hiding his involvement. D-93, a message from Bramly to Shapira arranging the broker payment, refers to a bank account that Bramly could use despite his circumstances: "Hi, there is an account in that I can transfer (not from me or related to me) $30,000 (in NIS) that you will transfer in US dollars?" This communication indicates Shapira

knew Bramly's assets were restrained, but decided to help him get around that constraint anyway.

Moreover, while it may or may not be legal, it is certainly not above board to draw on an LC at twice the amount of actual damages with a plan to remit the extra funds to the borrower. Shapira's vague excuse (Shapira Aff., ¶ 19), that he needed to make up for loss of the interest he would have received, rings hollow. First, the interest Shapira charged was negligible. The plan was NOT to protect Shapira. It was to split the proceeds with Bramly. Finally, despite claiming to rely on Regions to vet the issuing bank, at no point did Shapira inform Regions of the very salient point that ERA was loaning money to someone who was likely to default.

Finally, Shapira's depiction of himself as an unsophisticated party does not stand to reason. He alone runs ERA, a company that "mostly engages in real estate related investments, including acquisition, development and hard money lending with local partners" (Shapira Aff., ¶ 5). He even had prior experience with LCs in connection with development deals in Canada (*see* Shapira Aff., ¶ 10). Yet, he claims to not "understand how LCs worked" (*id.*). It is impossible to believe that someone running a company that loans or invests tens of thousands of dollars, and where repayment could depend on a LC, would not learn and verify how that LC "works."

Nor were the representatives from Soleil particularly credible, even though they were not the defendants on trial. The justification that they would require an indemnity from the beneficiary makes no sense as doing so would defeat the purpose of obtaining the LC altogether. What likely occurred is Soleil forgot or failed to obtain collateral and were trying to patch that over with the indemnity agreement. It is also not believable, given the facts of this case and the amount of their business collaboration, that SCC and SCB were not somehow related.

By contrast, McCorkell was very credible. He was clearly there because he cared about his reputation. He was most forthcoming and had nothing monetary to gain from testifying.

## CONCLUSIONS OF LAW AND ANALYSIS

The elements of negligent misrepresentation are: "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information" (*Mandarin Trading Ltd. v Wildenstein*, 16 NY3d 173, 180 [2011], quoting *J.A.O. Acquisition Corp. v Stavitsky*, 8 NY3d 144, 148 [2007]).

A. Special Relationship

> "Whether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a negligent misrepresentation is justified generally raises an issue of fact. In determining whether justifiable reliance exists in a particular case, a fact finder should consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and **whether the speaker was aware of the use to which the information would be put and supplied it for that purpose**"

(*Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 [1996] [emphasis added]; see also *Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, 2024 WL 4493644, at *20 (SDNY Oct. 15, 2024).

A special relationship to provide correct information, meanwhile, exists when "(1) the defendant **had awareness that its work was to be used for a particular purpose;** (2) there was reliance by a third party known to the defendant in furtherance of that purpose; and (3) there existed some conduct by the defendant linking it to that known third party evincing the defendant's understanding of the third party's reliance" (*Bayerische Landesbank v. Aladdin Cap. Mgmt. LLC*, 692 F3d 42, 59 [2d Cir. 2012], citing *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 551 [N.Y. 1985]; *see also Fleet Bank v Pine Knoll Corp.*, 290 AD2d 792,

[* 17]

795 [3d Dep't 2002] [noting that in the commercial context, a fact finder must consider "whether the speaker was aware of the use to which the information would be put and supplied it for that purpose"]). Finally, superior knowledge of alleged wrongdoing is not the type of unique or specialized expertise that would support a cause of action for negligent misrepresentation (*see RKA Film Fin., LLC v. Kavanaugh*, 171 A.D.3d 678, 680 [1st Dep't 2019]).

In general, a bank-customer relationship is arms-length (*see M & T Bank Corp. v. Gemstone CDO VII, Ltd.*, 68 AD3d 1747, 1750 [4th Dep't 2009] [the parties here "had no relationship prior to this arms-length transaction"]; *Harte v Ocwen Financial Group*, 2014 WL 4677120 at *16 [EDNY Sept 19, 2014] [no special relationship where defendant bank did not offer plaintiff "any particularized advice"]).

Here, plaintiff has not carried its burden to show that it had a special relationship with Regions. First, plaintiff has failed to show <u>Regions knew</u> its work was to be used for the particular purpose to vet the bank or ensure collateral was in place, such that a special relationship was formed relating to this issue. There is nothing in the record to support that: (1) Regions took on that responsibility, or (2) even knew that ERA wanted it to take on that responsibility.

Aside from Shapira's testimony that Regions was supposed to vet the bank, there is no proof. Moreover, Shapira's testimony does not hold up to scrutiny. In addition to his general lack of credibility, Shapira states at paragraph 25 of his direct affidavit that "McCorkell ended up recommending Soleil." This is not true. Shapira well knows that Soleil came into the picture through Bramly's WhatsApp message containing Bramly's draft letter of credit with the bait and switched name of the bank to SCB (D83-85). Yet, despite its high expectations of Regions, ERA

gave Regions absolutely no details about its interactions with Bramly, or that Bramly was responsible for the switch in bank names.

There is not a shred of evidence that Shapira hired Regions to vet the bank. Rather, the evidence is to the contrary. For example, it is undisputed that Shapira never paid Regions to investigate. The only fees Regions received totaled $510, a $355 advising fee on the $900k LC and a $155 advising fee on the $1.8M LC. ERA did not even pay these fees. SCC paid them. There is no evidence that ERA paid anything to Regions, and no documents exist showing that ERA hired Regions to investigate either SCB or SCC.

What the record does support is that Regions' role was limited. Foremost, Regions' letters explicitly denied any role beyond advising on the LC: "THIS LETTER IS SOLELY AN ADVICE OF THE ENCLOSED IRREVOCABLE STANDBY [LC] AND CONVEYS NO ENGAGEMENT OR RESPONSIBILITY ON OUR PART." This letter, sent after Region's supposed misleading statements, expressly states that there was no engagement other than advising on the letter of credit. Advising does not include vetting the bank or checking collateral. Shapira, as a sophisticated investor, should have known this, especially after McCorkell informed Shapira that Regions would only confirm an LC, which entailed greater responsibility on the part of Regions, if the issuer complied with certain requirements (McCorkell Aff., ¶ 8; J-8). The letter also expressly disclaims responsibility. Given the language of the disclaimer, Shapira should at least have inquired.

Nor is there any evidence that McCorkell knew the use to which ERA would put the limited information that McCorkell conveyed and that McCorkell supplied it for that purpose (i.e., to ensure that the bank was solid so that ERA could safely enter the LC). There is certainly

no evidence Shapira communicated that he was relying on Regions for due diligence beyond the OFAC check, which did not show any problems with SCB.

Thus, aside from plaintiff not proving that Regions had any obligation to vet the bank, the evidence actually shows Shapira knew all along that Regions was merely advising and that this did not involve in-depth due diligence on the bank. Moreover, McCorkell explained to Shapira that Regions' background check was limited to an OFAC search. Accordingly, there is no evidence in the record that Regions "had awareness that its work was to be used for a particular purpose." Certainly, ERA never told Regions it was relying on Regions to vet the bank beyond the OFAC and Swift check and would not enter the loan transaction otherwise.

Further, even if ERA had asked Regions to vet the bank, ERA set Regions up to fail. Plaintiff neglected to disclose Bramly's involvement and, in fact, took pains to hide it. For example, only Shapira knew that it was Bramly who switched issuing banks at the last minute. Shapira did not tell Regions that Bramly said the switching of the banks meant nothing because the bank was a mere intermediary, a patently false representation that Regions would have known to be false. ERA also participated in hiding Bramly as the source of the fees to pay Asseraf, the broker. Other than the messages between Bramly and Shapira, there was no record of Bramly's involvement in the loans or the LC transactions. Even if it had been Regions' responsibility to perform due diligence on Soleil with respect to this transaction, Regions did not stand a chance without knowing the suspicious nature of the underlying, possibly non-existent, real estate project and the involvement of a known fraudster. Yet, these were all issues of which Shapira had knowledge. Thus, after weighing all the evidence, the parties did not form a special relationship that would support a claim for negligent misrepresentation.

Plaintiff's cases in support of a special relationship are not relevant. For unknown reasons, plaintiff decided to cite *YS Marfin II LLC v FourWind Capital Advisors*, 2024 WL 12998 (January 10, 2024). This is a decision of this court on a motion to dismiss and the facts of which have nothing to do with this case whatsoever. Meanwhile, *Morgan Stanley & Co. v JP Morgan Chase*, 645 F Supp 2d 248 (SDNY 2009), also a motion to dismiss, involved an employee who actually stole a check. *Fleet Bank v Pine Knoll Corp*, 290 AD2d 792, 796 (1st Dep't 2002) is another decision on a motion to dismiss. Here, plaintiff has already survived the dispositive motion phase of this case. Now is the time for proof.

Plaintiff also cites *Banque Indosuez v. Barclays Bank*, 181 A.D.2d 447 (1st Dep't 1992). In *Banque Indosuez*, the plaintiff bank alleged that the defendant bank induced it to extend a loan to a nonparty based on potentially fraudulent letters of reference. Specifically, defendant's first letter of reference stated that the nonparty's $4M overdraft was "under review." Defendant's second letter of reference, signed the same day by the same loan officer, demanded repayment of the overdraft (*id.*). The Appellate Division, First Department upheld the trial court's denial of defendant's summary judgment motion, finding that "a jury could decide that the [defendant's] statement that the overdraft was 'under review' was an affirmative misrepresentation or a 'half-truth', and therefore fraudulent" (*id.*). As to the negligent misrepresentation claim, the First Department found: "although plaintiff did not 'hire' defendant to provide it with credit information concerning [nonparty] Cuyahoga, the claim is nonetheless viable because of the special relationship that existed between the parties" (*id.*). The First Department's decision is entirely silent as to the facts supporting the parties' "special relationship" (*see id.*).

While *Banque Indosuez* appears factually similar at first glance, it is a summary judgment case that is not relevant at this stage where trial has revealed that (1) <u>Plaintiff knew</u> Regions

[* 21]

"background check" was limited to government websites; (2) those websites did not reveal negative information; (3) plaintiff withheld important information from Regions and (4) Regions' engagement letter refuted any responsibility other than Advice on the LC.

In sum, these cases do not absolve plaintiff from its burden to establish a special relationship at trial (*see* decision after bench trial in *Maher v. Glob. Factors LLC*, 2024 WL 3356985, at \*29 [SDNY July 8, 2024] ["<u>The evidence establishes</u> that the transactions solicited, and ultimately executed, were 'nothing more than an arm's length business arrangement between sophisticated and experienced parties, a circumstance insufficient to create a 'special relationship.'"]).

B. <u>The Information from Regions Was Correct</u>

Nor has plaintiff established that the information McCorkell imparted was incorrect. McCorkell explained to Shapira in a phone call that the background check he was conducting was limited to the OFAC check that came up clean (McCorkell Aff., ¶ 17).

McCorkell did not ask Strickland to investigate Soleil, and Strickland was not involved in either of the LC transactions involving ERA (McCorkell Aff., ¶¶ 49-51; Strickland Aff., ¶ 9). Strickland's email referencing Soleil was merely an impression based on a limited Google search of SCC's landing page, a search done Strickland performed because he had not heard of Petroleo (*id.*, ¶¶ 9, 14). Moreover, the article Strickland sent to McCorkell rightly did not trigger alarm bells and a duty to disclose because the lawsuit concerned a contractual dispute between the account party and SCC over LC

issuance fees, not a wrongful dishonor claim. The failure to inform ERA (1) of Strickland's prior opinion that Soliel was "shady" in relation to an entirely different deal with a different bank customer and (2) the article Strickland found involving Soleil, but NOT an improper LC denial,

[* 22]

is not negligent given the subsequent check McCorkell performed using not only OFAC, but Swift.

## C. Reasonable Reliance

ERA has also failed to establish reasonable reliance. First, Shapira received Region's letter indicating that Regions' role was limited to advising on the letter of credit. This role did not include vetting the bank or verifying that collateral was in place. Given the language in the letter, at the very least Shapira should have followed up with McCorkell to let him know he was relying on Regions' opinion about the quality of the bank (*see Berkshire Bank v Pioneer Bank*, 72 Misc3d 1205(A) at *11-12 [Supreme Court, Albany Cty 2021] [no liability for omitting facts where terms of participation agreement refuted a special relationship]).

Before ERA accepted the earlier $900K LC, Shapira knew of Bramly's last minute bait and switch from Standard Chartered Bank to SCB as LC issuer and the false explanation that SCB was a mere intermediary. Shapira failed to inform Regions of Bramley's involvement or even that someone else had informed him that SCB was to be a mere intermediary. Instead, Shapira ignored the obvious signs of Bramly's intent to defraud ERA. Later, on the $1.8M LC transaction, ERA failed to verify the named but nonexistent borrower, IR Right, whether the real estate transaction actually existed, or SCB's receipt of collateral. This is all on ERA. It was unreasonable for ERA to enter into loans that were sure to fail with the thought that the LCs would bail him out. At the very least, this was a failure to mitigate damages.

## D. Proximate Cause

Nor was Regions' statement or omission the proximate cause of ERA's loss. The reason Soleil refused to make good on the LC was because Bramly failed to deliver collateral. ERA never asked Regions to check on the collateral. Nothing Regions said or did not say had anything

[* 23]

to do with the delivery of collateral. The vague statements Regions made that the bank "was good" did not cause the loss here. Nor did the failure to communicate Strickland's comments that SCB was "shady" (made before McCorkell performed the OFAC check) cause the loss. Plaintiff believed Bramly's lies that he was supplying the collateral. He did not. Soleil dishonored the LC because of the lack of collateral. Plaintiff's gripes, while substantial, are with Bramly and Soleil, not Regions.

Plaintiff's litany of distracting and irrelevant arguments at pages 39-49 of its post-trial brief do not merit discussion except as follows. Plaintiff accuses the court of having deferred to the start of trial that portion of ERA's motion in limine concerning the independence principle and then refusing to hear it (Pl. post-trial brief [EDOC 290] at pg 40). Plaintiff also complains "ERA was forced to try the case with no notice as to what the fraud defenses were. Until this post-trial briefing, Regions' new fraud defenses have never been briefed and ERA remains prejudiced as it still has no notice of what exactly the defenses are that it should be addressing."

These arguments are bewildering. First, the court did NOT defer on the issue of the independence principle and then refuse to address it. Rather, what the court said it would take up later involved the hundreds of document objections plaintiff had interposed. Because this was a bench trial, it was easier for the court to take up plaintiff's many objections during trial. The court's deferral had nothing to do with that part of the motion in limine having to do with the independence principle. That part of the motion was a summary judgment motion in disguise and the court rightly refused to address it.

Second, it is hypocritical for plaintiff to feign surprise that Regions raised Bramly's involvement during the trial. Plaintiff has known about Bramly before and during this entire case. The documents concerning Bramly were plaintiff's own documents! Plaintiff first did not

want Regions to know about Bramly and now it wants to keep the Bramly angle from the court's consideration.

Moreover, plaintiff certainly knew what Regions' defenses were. Defendants pled several affirmative defenses that are applicable, including comparative fault, intervening cause and failure to mitigate. Plaintiff knows about its own interactions with Bramly better than anyone. It should come as no surprise to plaintiff that he is called to task for failing to watch his back with a known fraudster.

## CONCLUSION

The court has considered plaintiff's remaining contentions and finds them unavailing.

The clerk is directed to enter judgment in favor of defendant, dismiss this case and mark it disposed.

<br>

_____

**DATE: 12/23/2024**

**MELISSA A. CRANE, JSC**

| | | | |
|---|---|---|---|
| **Check One:** | x | **Case Disposed** | ☐ **Non-Final Disposition** |
| **Check if Appropriate:** | x | **Other (Specify** | DECISION AFTER BENCH TRIAL ) |